George G. Mgdesyan, Esq. (State Bar No. 225476)
Araksya Boyadzhyan, Esq. (State Bar No. 299917)
**MGDESYAN LAW FIRM**
4529 Sherman Oaks Avenue
Sherman Oaks, CA 91403
**Email: araksya@mgdesyanlaw.com**
Telephone: (818) 386-6777
Facsimile: (818) 754-6778

Attorney for Plaintiff:
EDGAR YERKANYAN

## UNITED STATES DISTRICT COURT CENTRAL

## DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDGAR YERKANYAN | Case No.: |
| Plaintiffs, | **COMPLAINT** |
| vs. | (1) & (5) Fair Debt Collection Practices Act, 15 U.S.C. § 1692e; |
| MTC FINANCIAL INC. DBA TRUSTEE CORPS, AND REAL TIME RESOLUTIONS, INC., and DOES 1-10 | (2) & (6) Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788.17; (3) Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.; |
| Defendants. | (4) Declaratory Judgment, 28 U.S.C. § 2201; (7) Breach of Implied Covenant |

Plaintiff EDGAR YERKANYAN (hereinafter "Plaintiff") on behalf of himself and the classes set forth below, files this Complaint against MTC FINANCIAL INC. DBA TRUSTEE CORPS, AND REAL TIME RESOLUTIONS, INC.,(hereinafter "Defendant") alleges as follows:

## GENERAL ALLEGATIONS

1. This case concerns the increasingly common practice by debt collectors like Defendants to resurrect long-dormant second-lien mortgage debts after over a decade with no communications whatsoever to the borrowers on those debts, only to demand immediate payment of interest, fees, and principal that the borrowers had no opportunity to avoid.

As a result of this practice, Defendants now seek to collect and are collecting debts, including retroactively assessed interest and fees, from borrowers who rightfully believed those debts no longer existed, and who are now faced with the imminent and actual loss of their homes to foreclosure.

2. Not only is this practice unethical, but it also violates federal law and the express terms of the agreements governing these debts.

3. In the years leading up to the Great Recession, predatory subprime mortgage lenders targeted potential homebuyers like Plaintiff with what they marketed as a win-win offer: the opportunity to own a home without having to put down a single dollar. These so-called "80/20" mortgage schemes typically involved a two-pronged lending arrangement: a primary mortgage that covered 80% of the home's appraised value, plus a second "piggyback" mortgage—or, as here, a line of credit—that covered the remaining 20%. The second loan or line of credit operated as a functional downpayment and allowed borrowers to forgo the protections of mortgage insurance.

4. In 2005, Plaintiff was lured by such an offer. Along with a primary mortgage, he obtained a Home Equity Line of Credit ("HELOC") in the amount of $73,400.00. Plaintiff obtained a HELOC pursuant to an Agreement between COUNTRYWIDE BANK, N.A. in the amount of $73,400 for the property located at 10914 Hillhaven Avenue Los Angeles, California 91042-1418 legal description "Lot 7 of Tract No. 33782, in the City of Los Angeles, County of Los Angeles, State of California, as Per Map Recorded in Book 900 Page (s) 36 to 39 inclusive, of maps, in the office of the country recorded of said County. A.P.N. 2553-018-008 (hereinafter "SUBJECT PROPERTY" or "HOME").

5. The Truth in Lending Act ("TILA") and its enacting regulations required the creditor of Plaintiff's HELOC to provide monthly statements at all times in which there was an outstanding balance on the account. By law, this periodic statement needed to apprise Plaintiff of the amount he owed, including any interest and fees.

6. In 2014, Plaintiff fell on hard times, but he was able to obtain a loan modification. That loan modification allowed Plaintiff to stay in his home.

7. When his loan modification was approved, Plaintiff was led to believe that it included his HELOC, meaning that he would have one payment obligation relating to his home moving forward. In keeping with that understanding, Plaintiff remained current on his first mortgage from that point on.

8. Further cementing his belief that he was not behind on his HELOC, Plaintiff received no communications at all regarding his HELOC—no monthly statements, letters, or even phone calls—from that point to 2023 not even one.

9. Defendant Real Time Resolutions, Inc. alleges that in 2011 they purchased the lien held by COUNTRYWIDE BANK, N.A. and acquired the HELOC as it relates to Plaintiff's PROPERTY.

10. Despite these requirements, for over a decade, Mr. Yerkanyan received no statements regarding his HELOC, including after Real Time Resolutions, Inc in 2011.
During that period of silence, Plaintiff continued to build equity in his home by making regular payments on his first mortgage, which he assumed to be his only existing obligation relating to his home.

11. For the period of approximately 18 years Real Time Resolutions, Inc. failed to send any notice of deficiencies and/or notice of transfers to Plaintiff notifying him of the transfer of the lien or that no payments were made on the lien and that Plaintiff was in default.

12. While Real Time Resolution chose to remain silent, Mr. Yerkanyan continued to build equity in his home, providing an all-too-important nest egg to support himself.

13. It was not until 2023, that Defendant Real Time Resolutions, Inc. (of whom Plaintiff did not know up to this point) sent Plaintiff a correspondence demanding payment of $139,545.45. In 2023, Real Time Resolution, Inc also sent a correspondences claiming a payoff of $99,143.69.

14. In 2023 was the first ever written communication to claim that Mr. Yerkanyan still owed money on his HELOC.

15. Following said correspondence, Defendant Real Time Resolution, Inc., then issued a Notice of Sale of the SUBJECT PROPERTY along with Defendant MTC Financial Inc dba Trustee Corps (TS NO. CA 13000002-23-2) claiming Plaintiff was in default under the Lien Agreement and Deed of Trust dated September 7, 2005. ***The Notice of Sale regarding the property is scheduled for sale on April 22, 2025 at 10:00AM in the Civic Center Plaza, 400 Civic Center Plaza, Pomona CA 91766.***

16. Following the notice of sale, Defendant Real Time Resolution, Inc., sent a correspondence identifying a payoff of $154,345.11 which included a retroactively assessed fees for periods in which neither Defendants nor any other party sent monthly statements to Mr. Yerkanyan, specifically as to the alleged $76,615.00 in interest accrued.

17. Mr. Yerkanyan went from owing nothing on his HELOC and believing it no longer existed, to allegedly owing $99,143 in 2023 and $154,345.11 in 2025 the majority of which comprised interest and fees that he could have avoided had he received the monthly statements required by law.

18. Worse still, Real Time Resolution threatened to accelerate Mr. Yerkanyan's loan and to "commence foreclosure actions" if he did not pay the full amount claimed.

19. Defendants have now referred Mr. Yerkanyan's home to foreclosure and have continue to demand that he repay the highly inflated amounts to cure the alleged default.

20. Defendants' conduct has caused Mr. Yerkanyan significant financial and emotional harm, including but not limited to a reduction in his present and future home equity; deferral of repayment on his legitimate debts; emotional distress caused by the Notice of Default and the impending sale date of April 22, 2025, and the vastly inflated claims of his outstanding debt; and distress from Defendants' surprise threats of foreclosure after over a decade of

silence especially considering threats of losing his family home he has had for two decades in which him, his wife, and minor children reside.

21. Mr. Yerkanyan is far from the only victim of these opportunistic and predatory practices; indeed, as discovery will show, it is apparently standard policy and practice for Defendants to demand payment of waived principal balances and retroactively-assessed interest and fees for periods in which no monthly statements were provided by them or any current or prior owner or servicer on the consumers' HELOC debts.

22. With the threat of the foreclosure sale now looming, and with Defendants unwilling to halt their unlawful practices, Mr. Yerkanyan brings this action on behalf of himself and a class of similarly situated consumers for violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq.*, and breach of contract.

23. Mr. Yerkanyan also seeks declaratory relief for himself and the putative class members under the Declaratory Judgment Act, 28 U.S.C. § 2201.

## **PARTIES**

24. At all times herein mentioned, Plaintiff EDGAR YERKANYAN was and is an individual residing in the County of Los Angeles, State of California. Plaintiff is a consumer as defined by 15 U.S.C. § 1692a(3).

25. Plaintiff is informed and believe and therein allege that at all times herein mentioned, Defendant MTC FINANCIAL INC, is a California corporation doing business in County of Los Angeles, State of California under dba Trustee Corps with its principal business in 17100 Gillette Ave Irvine, CA 92614.

26. Real Time Resolution, Inc., is a corporation formed in Texas, operating and conducting business in the State of California. Real Time Resolution, Inc is a debt collector under 15

U.S.C. § 1692a(6) because it treated Mr. Yerkanyan's loan as in default at the time it
acquired the loan's servicing rights. *See Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355,
362 (6th Cir. 2012); *Schlosser v. Fairbanks Cap. Corp.*, 323 F.3d 534, 537–38 (7th Cir.
2003). Real Time Resolution, Inc.'s demand for payment to Yerkanyan also stated "Real
Time Resolutions, Inc. is a debt collector. This is an attempt to collect a debt, and any
information obtained will be used for that purpose.."

27. Real Time Resolutions, Inc., is as a debt buyer, is a debt collector pursuant to 15 U.S.C. §
1692a(6) because its principal business purpose is the purchase of defaulted debts for
collection. *See McAdory v. M.N.S. & Assocs., LLC*, 952 F.3d 1089 (9th Cir. 2020).

28. Real Time Resolutions, Inc. also uses, either directly or through its agents such as the
mail and other instrumentalities of interstate commerce for the purposes of collecting or
attempting to collect consumer debts.

29. Plaintiff is ignorant of the true names and capacities of Defendants sued herein as DOES
1 through 100, inclusive, and therefore sue these Defendants by these fictitious names.
Plaintiffs will amend this Complaint to allege their true names and capacities when
ascertained. Plaintiff are informed and believe and thereon allege that each of the
fictitiously named Defendants is responsible in some manner for the occurrences herein
alleged, and that Plaintiff's damages as herein alleged were proximately caused by those
Defendants.

30. Plaintiff is informed and believes and thereon alleges that at all times material to this
Complaint, each of the Defendants and the each of the Defendants fictitiously named in
this Complaint, in addition to acting for himself, herself, or itself and on his, her, or its
own behalf individually, is and was acting as the agent, servant, employee and

representative of, and with the knowledge, consent and permission of, and in conspiracy with, each and all of the Defendants and within the course, scope and authority of that agency, service, employment, representation, and conspiracy

## FACTS
### *Zombie Second Mortgages*

31. This case arises from the recent wave of attempts to collect "zombie" second mortgages—largely, subprime second mortgages (or lines of credit). Many of these second-lien mortgages and HELOCs were charged off as part of the mortgage crisis, whether through modification programs, government settlements. As a result of this charge off, these debts no longer incur interest or late fees. Once charged off, consumers also no longer received statements or heard anything about their second-lien debts, sometimes for more than over a decade, like Mr. Yerkanyan

32. Unbeknownst to many consumers, however, their debts did not go away.

33. Instead, they were sold—often several times—to various debt buyers.

34. Now, with the recent surge in housing prices, consumers have significant equity in their homes that make charged-off second-lien debts highly profitable.

35. Unsurprisingly, therefore, debt buyers are now seeking to collect on defaulted second mortgages and credit lines and, if consumers cannot pay, they are foreclosing on homes, selling the property, and taking the (often significant) equity to pay the outstanding loan—which they likely bought for pennies on the dollar.

36. This highly profitable scheme has surged in recent months, as home prices have increased and COVID foreclosure moratoriums have expired.

37. The debt buyer here, Real Time Resolution, Inc., along with its agent are is using the foreclosure process to collect money to which it is not entitled, substantially downgrading the equity earned by consumers in their homes after recovering from the housing crisis.

38. Even worse, as outlined below, debt collectors like Defendants are collecting on debts in violation of the terms of the second mortgage lines of credit, such as the HELOC here, which expressly required the owner of the HELOC to send periodic statements to the borrower if a balance is owed and to disclose if any interest and fees are assessed for that billing period.

39. Defendants are also violating federal law and regulations, which require periodic statements for open-end consumer lines of credit, including a HELOC. 15 U.S.C. § 1637; 12 C.F.R. § 1026.7.

40. Specifically, § 1637(b) of TILA provides that "[t]he creditor of any account under an open end consumer credit plan shall transmit to the obligor, for each billing cycle at the end of which there is an outstanding balance in that account or with respect to which a finance charge is imposed, a statement setting forth," among other things: (1) the outstanding balance of the account at the beginning of the period; (2) the finance charge applied to the outstanding balance; and (3) the outstanding balance at the end of the period.

41. The regulations enacting TILA similarly require the creditor of a home equity plan to provide periodic statements disclosing, among other information, the outstanding balance of the credit plan for the period in question and the periodic interest charged on the balance. 12 C.F.R. § 1026.7.

42. These disclosure requirements are intended to prevent deceptive practices by

creditors and debt collectors by precluding them from hiding the ball only to demand payment for surprise interest and fees later on—the precise conduct at issue here.

43. Despite their own assumed obligations under Mr. Yerkanyan's and the putative class member's credit line agreements and the requirements imposed by federal law, Defendants are out of the blue demanding payments from consumers of waived balances and retroactively assessed late fees and interest, in violation of both state and federal law.

44. In Mr. Yerkanyan's case, for example, his new loan balance is nearly twice his original credit limit, and far higher than any amount he ever withdrew on his HELOC.

45. When debt collectors, like Defendants here, can foreclose on properties and collect these improper charges, it not only robs the consumers of their homes, but it also strips them of tens of thousands of dollars in equity—one of the primary ways that low- and middle-income families can build wealth.

46. The improper charges also make it more difficult to refinance these loans, thereby ensuring that consumer will need to pay them either through a foreclosure sale or payoff.

47. The attempted foreclosure of Mr. Yerkanyan home is unlawful because Real Time Resolution is attempting to collect amounts that are not owed by Mr. Yerkanyan.

48. By not sending monthly statements, Defendants and their predecessors-in-interest acted contrary to the terms of the HELOC Agreement and federal law, leading Mr. Yerkanyan and similarly situated consumers to reasonably believe that the HELOC loans under those agreements had been discharged or the outstanding balances were waived. Mr. Yerkanyan and the putative class members relied on this reasonable belief in making debt obligation and repayment decisions, to their later detriment.

49. In fact, under federal law, Real Time Resolution, Inc., and its predecessors-in-interest

were required to provide statements for any billing cycle at the end of which there was an outstanding balance. 15 U.S.C. § 1637(b); 12 C.F.R. § 1026.7. By not providing periodic statements, therefore, Real Time Resolution, Inc., and its predecessors confirmed to Mr. Yerkanyan that no outstanding balance, including interest and fees, existed on their HELOC loans for the billing cycles in question.

50. Further, by not providing monthly statements to Mr. Yerkanyan and the putative class members, Defendants rendered it impossible for Mr. Yerkanyan and the class members to perform under their respective credit line agreements and avoid the accumulation of debt that Defendants now seek to enforce, as Mr. Yerkanyan and the class had no notice of the outstanding or accumulated debt such that they could repay it.

51. By acting as if the debts had been discharged or waived and then seeking, more than a decade later and with no notice to Mr. Yerkanyan and the class members, to enforce the debt, Defendants have waived their right to enforce the debts in question.

52. Because of Defendants' conduct, Mr. Yerkanyan has suffered, and continues to suffer, financial and emotional harm, including but not limited to a reduction in his present and future home equity; deferral of repayment on his legitimate debts; emotional distress caused by the inaccurate Notice of Default and the vastly inflated claims of his outstanding debt; and distress from Defendants' surprise institution of foreclosure after a decade of silence.

## CLASS ACTION ALLEGATIONS

53. Plaintiff brings his claims on behalf of himself individually and, on behalf of the following classes:

### FDCPA Class

All California consumers who (i) are or were obligors with respect to an open-end home-equity line of credit ("HELOC"); (ii) serviced or owned by Defendants; (iii) whose HELOC was in default at the time that Defendants acquired the HELOC or its servicing rights; (iv) to whom Defendants (or their predecessors-in-interest) failed to send periodic statements; and (v) to whom Defendants or their agents, during the one-year period prior to the filing of the initial Complaint, sent written correspondence that demanded payment of interest or late fees purportedly accrued during any period in which Defendants or their predecessors-in-interest failed to send periodic statements.

### Rosenthal Act Class

All California consumers who (i) are or were obligors with respect to an open-end home-equity line of credit ("HELOC"); (ii) serviced or owned by Defendants; (iii) to whom Defendants (or their predecessors-in-interest) failed to send periodic statements; and (iv) to whom Defendants or their agents, during the one-year period prior to the filing of the initial Complaint, sent written correspondence that included interest or late fees for a period in which Defendants or their predecessors-in-interest had failed to send periodic statements.

### UCL Class

All California consumers who (i) are or were obligors with respect to an open-end home-equity line of credit ("HELOC"); (ii) serviced or owned by Defendants; (iii) to whom Defendants (or their predecessors-in-interest) failed to send periodic statements; and (iv) to whom Defendants or their agents, during the four-year period prior to the filing of the initial Complaint, sent written correspondence that included interest or late fees that purportedly accrued during any period in which Defendants or their predecessors-in-interest had failed to send periodic statements.

Declaratory Judgment Class

All California consumers who (i) are or were obligors with respect to an open-end home-equity line of credit ("HELOC"); (ii) owned by Real Time Resolution, Inc.(iii) to whom Real Time Resolutions, Inc. or its predecessors-in-interest failed to send periodic statements; and (iv) from whom Real Time Resolutions, Inc. has asserted a right to collect interest or late fees that purportedly accrued during any period in which Real Time Resolutions, Inc., or its predecessors-in-interest failed to send periodic statements.

54. Plaintiff is a member and representative of all of the Classes.

55. Questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

56. Numerosity: The Classes are so numerous that joinder of all class members is impracticable. Given the volume of Defendants' business, there exist hundreds or thousands of class members.

Commonality: This case presents common questions of law and fact, including but not limited to: a. Whether Defendants violated the FDCPA and the Rosenthal Act by making false representations about the character, amount, or legal status of a debt; threatening to take actions that could not be legally taken; using false representations to attempt to collect a debt; and/or attempting to collect an amount not expressly authorized by a loan agreement; b, Whether Defendants' conduct was unlawful, unfair, or fraudulent under the UCL; c. The proper scope of injunctive relief; and d. The proper measure of damages.

Typicality: Plaintiff's claims are typical of the members of the Classes. The FDCPA, Rosenthal Act, and UCL violations suffered by Plaintiff are typical of those suffered by other class members, and Defendants treated Plaintiff consistently with other class members, in accordance with their standard policies and practices. Discovery will show that Defendants used automated processes to generate and send form debt-collection correspondence to class members and that Defendants maintain electronic records showing which form correspondence was sent to each class member, as well as the

date(s) on which such correspondence was sent. Discovery will also show that these debt-collection communications were often identical in both form and substance, except only for recipient-specific information about the recipient's name and address and the specific amounts Defendants claimed were owed. Discovery will also show that Defendants maintain electronic records of amounts that they contend are owed by each borrower, as well as amounts paid by each borrower, including records of the dates on which each payment was made.

Adequacy: Plaintiff will fairly and adequately protect the interests of the Classes because he and his experienced counsel are free of any conflicts of interest and are prepared to vigorously litigate this action on behalf of the Classes.

Predominance & Superiority: Class certification is appropriate because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct, as described in this Complaint, stems from common and uniform policies and practices, and it has resulted in common violations of the FDCPA, the Rosenthal Act, and the UCL. Members of the Classes do not have an interest in pursuing separate actions against Defendants, as the value of each class member's individual claim is small compared to the substantial expense, burden, and uncertainty of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation, which might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

57. The administration of this action can be handled by class counsel or a third-party administrator, and the costs of administration will represent only a small fraction of the ultimate recovery to be achieved.

**COUNT ONE:**

**VIOLATION OF FDCPA, 15 U.S.C. § 1692e(2) and e(10)**

**(*Individually on behalf of Class and Against Real Time Resolution, Inc.*)**

58. Plaintiff incorporates the preceding allegations.

59. Real Time Resolution, Inc., (hereinafter Real Time) violated § 1692e(2) of the FDCPA by making false and misleading statements about the amount or validity of the HELOC debts allegedly owed by Plaintiff.

60. Real Time further violated § 1692e(10) of the FDCPA by using false representations to collect or attempt to collect debts from Plaintiff.

61. The FDCPA outlaws, among other conduct, the following debt collection practices: making false representations about the character, amount, or legal status of a debt (15 U.S.C. § 1692e(2)(A)); threatening to take action that cannot be legally taken (15 U.S.C. § 1692e(5)); and using a false representation to collect or attempt to collect a debt (15 U.S.C. § 1692e(10)).

62. Defendants violated each of these provisions with respect to Plaintiff and the members of the FDCPA Class when they attempted to collect retroactively assessed interest and/or late fees that were illegal because they had purportedly accrued during a period in which Defendants had violated TILA and Regulation Z by failing to send periodic statements, including by making Plaintiff and the putative class members loan modification offers that included these illegal amounts.

63. Plaintiff and each member of the FDCPA Class suffered a concrete injury-in-fact as a result of Defendants' misrepresentations, including, for example, a reduction in home equity, the assessment of improper fees, defamation, emotional distress caused by the possible loss of their home and equity, intrusion upon seclusion, and informational injury that caused adverse impacts on their debt-making decisions and impaired their ability to resolve their HELOCs and avoid foreclosure.

64. For years—and, in the case of Plaintiff, for over a decade—the creditors on the HELOC debts serviced by Real Time and its predecessors-in-interest failed to provide monthly statements required by both Plaintiff's credit line agreements and/or federal law.

65. Indeed, federal law requires creditors of HELOC plans to provide periodic

66. statements disclosing the interest and fees owed by consumers for each billing cycle in which there is an outstanding balance. 15 U.S.C. § 1637; 12 C.F.R. § 1026.7.

67. Despite this, Real Time has represented to Plaintiff in connection with the collection or attempted collection of their HELOC debts that they owe principal, interest, and fees for periods in which no periodic statements were provided to Plaintiff.

68. Real Time's statements were false. Plaintiff did not owe the interest and fees because Plaintiff's repayment of the interest and fees was rendered impossible by the failure to provide periodic statements notifying them of any outstanding balance or interest and fees, thereby excusing Plaintiff's nonperformance and waiving Real Time right to collect the amounts allegedly owed.

69. Based on Defendants' and their predecessors-in-interest's failure to provide

70. periodic statements, as required by contract and law, Plaintiff also reasonably believed that his HELOCs had been discharged such that they no longer owed any debt on those HELOCs, which belief Plaintiff relied on in making debt obligation and repayment decisions during the period in which they were not receiving such statements.

71. Real Time is thus now estopped from collecting the purported debt obligations under Plaintiff's credit line AGREEMENT.

72. Plaintiff thus did not owe any principal, interest and fees for the periods in which they did not receive any periodic statements, and Real Time's statements to the contrary are false.

73. Such conduct violates the law as Plaintiff had no notice of or opportunity to make payments on the debt that Real Time now claims he owes.

74. Because of Real Time's violations of 15 U.S.C. §§ 1692e(2) and 1692e(10), Plaintiff and the putative class have suffered actual damages, including significant emotional distress,

reduction in their present and future home equity, deferral of repayment on their legitimate debts, and, in the case of some class members, payment of the improperly assessed principal, interest and fees.

75. Based on Real Time's violations of §§ 1692e(2) and 1692e(10), Plaintiff and the

76. putative class are entitled to actual damages, statutory damages, reasonable attorneys' fees, and costs under 15 U.S.C. § 1692k.

77. Real Time Resolutions' conduct was also a violation of federal law, which requires creditors of HELOC plans to provide periodic statements disclosing the interest and fees owed by consumers for each billing cycle in which there is an outstanding balance. 15 U.S.C. § 1637; 12 C.F.R. § 1026.7

78. Mr. Yerkanyan thus did not owe any principal, interest and fees for the periods in which he did not receive any periodic statements, and Real Time's statements to the contrary are false.

79. Such conduct violates the law as Mr. Yerkanyan had no notice of or opportunity to make payments on the debt that Defendants now claim he owes.

80. Because of Real Time Resolutions violations of 15 U.S.C. §§ 1692e(2) and 1692e(10), Mr. Yerkanyan has suffered actual damages, including significant emotional distress, reduction in his present and future home equity, and deferral of repayment on his legitimate debts.

81. Based on Real Time Resolution violations of §§ 1692e(2) and 1692e(10), Mr. Yerkanyan is entitled to actual damages, statutory damages, reasonable attorneys' fees, and costs under 15 U.S.C. § 1692k.


**COUNT TWO**
**Violation of Rosenthal Fair Debt Collection Practices Act**
**Cal. Civ. Code § 1788.17**
*(Individually and on behalf of the Rosenthal Act Class Against Defendants)*

82. Plaintiff incorporates the preceding allegations.

83. Section 1788.17 of the Rosenthal Act provides that "every debt collector collecting or attempting to collect a consumer debt shall comply with the provisions of Sections 1692b to 1692j, inclusive, of, and shall be subject to the remedies in Section 1692k of, Title 15 of the United States Code." In other words, the Rosenthal Act incorporates by reference the provisions and remedies of the FDCPA, including 15 U.S.C. §§ 1692e and 1692k.

84. Section 1788.2(c) of the Rosenthal Act defines a "debt collector" to include "any person who, in the ordinary course of business, regularly, on behalf of that person or others, engages in debt collection." This broad definition of "debt collector" applies to the FDCPA provisions incorporated by reference into Section 1788.17 of the Rosenthal Act, including 15 U.S.C. §§ 1692e and 1692k. Thus, the Rosenthal Act applies the FDCPA's substantive provisions to a broader group of actors.

85. Defendants therefore violated Section 1788.17 of the Rosenthal Act with respect to Plaintiff and the members of the Rosenthal Act Class when they attempted to collect retroactively assessed interest and late fees that were illegal because they had purportedly accrued during a period in which Defendants violated TILA and Regulation Z by failing to send periodic statements, including by sending Plaintiff and the putative class members loan modification offers that contained these illegal amounts.

86. Plaintiff and each member of the Rosenthal Act Class suffered a concrete injury-in-fact as a result of Defendants' misrepresentations, including, for example, a reduction in home equity; the assessment of improper fees; defamation, emotional distress caused by the possible loss of their home and equity, intrusion upon seclusion, and informational injury that caused adverse impacts on their debt-making decisions and impaired their ability to resolve their HELOCs and avoid foreclosure.

87. In addition, some members of the Rosenthal Act Class suffered actual damages when they paid these improper fees and interest to Defendants.

88. Under 15 U.S.C. § 1692k, as incorporated by § 1788.17 of the Rosenthal Act, Plaintiff seeks actual and statutory damages for themselves and for each member of the Rosenthal Act Class, plus their reasonable attorneys' fees and costs. He also seeks actual damages

for members of the Rosenthal Act Class members who paid improper interest or fees to Defendants, in the amount of any such interest or fees.

## COUNT III
### California Unfair Competition Law
### Cal. Bus. & Prof. Code §§ 17200 *et seq.*
### *(Individually and on behalf of the UCL Class Against Defendants)*

89. Plaintiff incorporates the preceding allegations.

90. California's Unfair Competition Law ("UCL") prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

91. By prohibiting "unlawful business practices," the UCL effectively "borrows" violations of other laws and "treats them as unlawful practices that the unfair competition law makes independently actionable." De La Torre v. CashCall, Inc., 5 Cal. 5th 966, 980 (2018).

92. The remedies provided by the UCL "are cumulative to each other and to the remedies or penalties available under all other [California] laws." Cal. Bus. & Prof. Code § 17205.

93. An action for relief under the UCL may be brought by any person "who has suffered injury in fact and has lost money or property as a result" of the complained-of conduct.

94. Here, Defendants' practices were "unlawful" under the UCL because, as alleged above, they violated TILA, the FDCPA, and the Rosenthal Act.

95. Defendants' practices were also "unfair" under the UCL because it is unethical, immoral, unscrupulous, oppressive, and substantially injurious to consumers to fail to communicate fees and interest for years, sometimes a decade or more, allowing balances to balloon without any notice to the consumers that might permit them to mitigate the harm.

96. Further, Defendants' practices were "fraudulent" because they made false statements about the amounts legally owed by Plaintiff and members of the UCL Class and they omitted information necessary for Plaintiff and members of the UCL Class to assess the truth of Defendants' claims (i.e., that the debts to which Defendants claimed to be entitled were not owed due to Defendants' failure to provide periodic statements).

97. The harm caused by these business practices vastly outweighs any legitimate utility they possibly could have.

98. Plaintiff and members of the UCL Class suffered injuries in fact and have lost money or property because of Defendants' practices, which have caused an increase in their debt loads and a decrease in their home equity.

99. Because, to this day, Defendants persist in their efforts to collect these illegitimate fees and interest, there is a real and immediate threat that Plaintiff and members of the UCL Class will suffer these same injuries again.

100. Plaintiff and members of the UCL Class are therefore entitled to injunctive relief to correct the balances on their HELOCs; actual damages in the amount of any illegal fees or charges paid by the class members; and the recovery of their reasonable attorneys' fees and costs.

<u>**COUNT IV**</u>
**DECLARATORY RELIEF**
**28 U.S.C. § 2201**

***(Individually and on behalf of the UCL Class Against Defendants)***

101. Plaintiff incorporates the preceding allegations.

102. Because Plaintiff and class members were not provided periodic statements, all interest and fees assessed for periods in which Real Time or its predecessors-in-interest failed to provide periodic statements are waived or unenforceable.

103. Plaintiff and members of the Classes are subject to ongoing harm absent a declaration that interest and fees are waived or unenforceable, including the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

104. This dispute and controversy is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties. as well as the validity, if any, of the disputed interest and fees.

105. Under 28 U.S.C. § 2201, there exists an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving Defendants' ongoing attempted imposition of retroactive interest and fees.

106. Accordingly, Plaintiff seeks a declaratory judgment that all interest and fees assessed for periods in which Real Time or its predecessors-in-interest failed to provide periodic statements are waived or unenforceable.

### COUNT V
### FDCPA
### 15 U.S.C. § 1692f(6)

***(Individually on behalf of Plaintiff Against Defendants)***

107. Plaintiff incorporates the preceding allegations.

108. Defendants violated 15 U.S.C. § 1692f(6) when they attempted to foreclose on Plaintiff's property. Defendants did not have any present right to possession of the property at the time that they scheduled the foreclosure sale.

109. For example, Defendants lacked the present right to possession of Plaintiff's property because they never sent Plaintiff a Notice of Default that complied with Cal. Civ. Code § 2924. The Notice of Default that Plaintiff received did not contain the correct amount of the delinquency required to cure the default, which is a condition precedent to foreclosure under California law. Instead, it overstated the amount of the debt by more than tens of thousands of dollars.

110. This defect in the Notice of Default was material, and it adversely affected Plaintiff's rights because it made it appear as if he owed significantly more than his actual loan balance.

111. Any other actions that Defendants took towards the foreclosure of Plaintiff's property after it scheduled the foreclosure sale, including ordering a title search or advertising the foreclosure sale, also violated the FDCPA.

112. As a result of Defendants' violations of 15 U.S.C. § 1692f, Plaintiff suffered actual damages, including significant emotional distress.

113. Based on Defendants' violation of § 1692f, Plaintiff is entitled to actual damages, statutory damages, reasonable attorneys' fees, and costs under 15 U.S.C. § 1692k.

## COUNT VI
## Rosenthal Fair Debt Collection Practices Act
## Cal. Civ. Code § 1788.17
### *(Individually on behalf of Plaintiff Against Defendants)*

114. Plaintiff incorporates the preceding allegations.

115. Section 1788.17 of the Rosenthal Act provides that "every debt collector collecting or attempting to collect a consumer debt shall comply with the provisions of Sections 1692b to 1692j, inclusive, of, and shall be subject to the remedies in Section 1692k of, Title 15 of the United States Code." In other words, the Rosenthal Act incorporates by reference the provisions and remedies of the FDCPA, including 15 U.S.C. §§ 1692f(6) and 1692k.

116. Section 1788.2(c) of the Rosenthal Act defines a "debt collector" to include "any person who, in the ordinary course of business, regularly, on behalf of that person or others, engages in debt collection." This broad definition of "debt collector" applies to the provisions of FDCPA incorporated by reference into Section 1788.17 of the Rosenthal Act, including 15 U.S.C. §§ 1692f(6) and 1692. Thus, the Rosenthal Act applies the FDCPA's substantive provisions to a broader group of actors.

117. Defendants violated Section 1788.17 of the Rosenthal Act when they attempted to foreclose on Plaintiff's home. Defendants did not have any present right to possession of Plaintiff's home at the time that it scheduled the foreclosure sale.

118. For example, Defendants lacked the present right to possession of Plaintiff's property because they never sent Plaintiff a Notice of Default that complied with Cal. Civ. Code § 2924. The Notice of Default that Plaintiff received did not contain the correct amount of the delinquency required to cure the default, which is a condition precedent to foreclosure under California law. Instead, it overstated the amount of the debt by more tens of thousands of dollars.

119. This defect in the Notice of Default was material, and it adversely affected Plaintiff's rights because it made it appear as if he owed significant more than his actual loan balance.

120. Any other actions that Defendants took towards the foreclosure of Plaintiff's property after it scheduled the foreclosure sale, including ordering a title search or advertising the foreclosure sale, also violated the Rosenthal Act.

121. As a result of Defendants' violations of 15 U.S.C. § 1692f, Plaintiff suffered actual damages, including significant emotional distress.

122. Under Cal. Civil Code § 1788 and 15 U.S.C. § 1692k, Plaintiff seeks actual and statutory damages for himself, plus his reasonable attorneys' fees and costs.

## COUNT VII
## Breach of Implied Covenant
### *(Individually on behalf of Plaintiff Against Defendants)*

123. Plaintiff incorporates the preceding allegations.

124. Under California law, every contract or agreement contains an implied promise of good faith a fair dealing. Comunale v. Traders & General Ins. Co., 50 Cal. 2d 654, 658 (1958). The covenant not only creates an obligation that the Defendants not hinder or prevent I have Plaintiff's ability to perform under the contract, but also requires each party to refrain from unfairly interfering with the right of the other party to receive the benefits of the contract. Id.

125. Plaintiff was in a contractual relationship with both Defendants under the Deed of Trust.

126. As such, the Defendants had a contractual obligation to refrain from hindering Plaintiff's performance under the Deed of Trust.

127. By failing to transmit a single monthly statement for over six years and ceasing all collection activities until they recorded a Notice of Default, Defendants allowed Plaintiff to reasonably believe he no longer owed a debt. As a result, Plaintiff did not make payments on the loan, which caused him to accrue a significant amount of interest. Had he

received monthly statements, he could have mitigated these interest charges by making payments or seeking a loan modification earlier. Simply put, Defendants, through their own inaction, interfered with Plaintiff's ability to perform under the Deed of Trust.

128. Because of the Defendants' breaches of the covenant of good faith and fair dealing, Plaintiff suffered and continues to suffer actual damages including, but not limited to, the imminent loss of his Property, the loss of significant equity in his property, and other fees and charges that he does not owe, including foreclosure fees

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Classes, seeks the following relief:

a. Determining that this action may proceed as a class action;

b. Designating Plaintiff as the class representative for the Classes;

c. Designating Plaintiff's Counsel as counsel for the Classes;

d. Issuing proper notice to the Classes at Defendants' expense;

e. Declaring that Defendants committed multiple, separate violations of the FDCPA, the Rosenthal Act, and the UCL;

f. Declaring that amounts claimed by Defendants are not owed;

g. Awarding actual and statutory damages as provided by the FDCPA, the Rosenthal Act, and the UCL;

h. Granting appropriate injunctive relief, including restitution and disgorgement, as provided by the UCL;

i. Awarding reasonable attorneys' fees and costs and expenses; and

j. Granting other relief, in law or equity, as this Court may deem appropriate and just.

///

///

///

///

## JURY DEMAND

Plaintiff, on behalf of himself and the Classes, demands a trial by jury on all issues triable by a jury.

DATED: April 18, 2025                    MGDESYAN LAW FIRM


*Araksya Boyadzhyan*
─────────────────────────────
ARAKSYA BOYADZHYAN, ESQ.
GEORGE MGDESYAN, ESQ.,
Attorneys for Plaintiff

# PROOF OF SERVICE
(1013A, 2015.5, C.C.P.)

STATE OF CALIFORNIA )
) **ss.**
)
COUNTY OF LOS ANGELES )

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within entitled action; my business address is 4529 Sherman Oaks Avenue, Sherman Oaks, California 91403. I am readily familiar with the business practice at my place of business for collection and processing of correspondence for mailing with the United States Postal Service. Correspondence so collected and processed is deposited with the United States Postal Service that same day in ordinary course of business.

On April 18, 2025 I served **COMPLAINT** on the interested parties in this action as stated on the attached service list as follows:

(  ) – BY MAIL:  I caused such envelope with postage thereon fully prepaid at my place of business to be placed in the United States mail at Sherman Oaks, California.

(  ) – BY PERSONAL SERVICE:  I caused such envelope to be delivered by hand to the office of the addressee(s).

(  ) – BY FACSIMILE:  Pursuant to CCP §1013(e) and (f) and CRC Rule 2008, on (  ), at approximately I served the above stated documents by facsimile from the facsimile machine of _____, whose fax number is _____, to the fax number(s) as stated on the attached service list. The facsimile machine used complies with CRC Rule 2003(3). Pursuant to CRC Rule 2008(e) the transmission be facsimile was reported as complete and without error.

(  ) – BY FEDERAL EXPRESS: I am readily familiar with the business practice at my place of business for collection and processing of documents and correspondences for overnight delivery by Federal Express on the same day in the ordinary course of business. On the below date said envelope was deposited at the Federal Express Drop in Sherman Oaks, California by 5:00pm.

**(X)** – BY ELECTRONIC MAIL:  by submitting an electronic version of the above referenced documents to the email address(s) as stated on the attached service list.

**(X)** – STATE:  I declared under penalty of perjury under the laws of the State of California that the above is true and correct.

Dated: April 18, 2025

By: *Araksya Boyadzhyan*
Araksya Boyadzhyan

COMPLAINT

- 25 -

## SERVICE LIST

VIA EMAIL:
Brian J. Wagner (SBN 239981)
Jennifer L. Andrews (SBN 222807)
brian.wagner@kutakrock.com
Jennifer.Andrews@kutakrock.com
KUTAK ROCK LLP
5 Park Plaza, Suite 1500
Irvine, California 92614-8595
Telephone: (949) 417-0999
Facsimile: (949) 417-5394
Attorneys for Defendant REAL TIME
RESOLUTION INC


VIA EMAIL:
STEELE LLP John C. Steele, State Bar No. 179875
17272 Red Hill Avenue Irvine,
California 92614
Telephone: 949.222.1161
Fax: 949.221.9500
Email: jsteele@steelellp.com
Attorneys for Defendant
MTC FINANCIAL INC. dba TRUSTEE CORPS